## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DYNCORP INTERNATIONAL LLC,**<br>1700 Old Meadow Road<br>McLean, VA 22102<br><br>**Plaintiff,**<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF STATE,**<br>2201 C Street N.W.<br>Washington, D.C. 20520<br><br>and<br><br>**JAMES A. WALSH,** in his official capacity as<br>Senior Bureau Official for International Narcotics<br>and Law Enforcement Affairs<br>2201 C Street N.W.<br>Washington, D.C. 20520<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Case No. _____** |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff DynCorp International LLC ("DI"), by and through its undersigned counsel, files this Complaint for declaratory and injunctive relief against Defendants U.S. Department of State Bureau of International Narcotics and Law Enforcement Affairs, and Senior Bureau Official James A. Walsh (collectively referred to as the "Bureau" or "Defendants"), and states as follows:

## NATURE OF THE ACTION

1.  Unfortunately, DI's attempts to resolve this matter cooperatively with the Bureau have not been successful and DI is now compelled to file this Complaint in order to protect its intellectual property rights.  DI has performed a critical contract for the Bureau for twenty-three

years.  During that time, DI has utilized and catalogued extensive DI proprietary know-how into Standard Operating Procedures and related documents ("DI SOPs"), that it was required to place on the Bureau's server to access in the austere global environments where DI performed its work.  These DI SOPs were universally recognized as proprietary to DI and marked and treated as such for decades, DI never waived its rights to these proprietary DI SOPs, and these DI SOPs were never contract deliverables to the Bureau.  After a new contractor began a transition to take over the work previously performed by DI, DI sought assurances that its proprietary DI SOPs would be protected, and the Bureau expressly promised, in writing, to give DI such protection. When the new contractor could not meet its obligations to deliver new SOPs to the Bureau, however, the Bureau—without any authority and contrary to law—gave unlimited access to the proprietary DI SOPs to the new contractor (and DI's direct competitor).  DI respectfully asks the Court to stop the Bureau's continuing and unlawful disclosure of DI's trade secrets to DI's direct competitor.

2.     The trade secrets include confidential documents developed by DI, which set forth DI's proprietary internal procedures and protocols used to perform various government contracts, including a contract between DI and the Bureau.

3.     DI has a direct economic interest in protecting the confidentiality of its trade secrets, which are crucial to its ability to compete for future performance-based government contract and commercial work.

4.     DI has and will continue to be competitively harmed by the Bureau's release and unlawful disclosure of DI's trade secret information, especially to DI's direct competitor for government contracts of this type.

5.      The Bureau's final agency action refusing to stop this disclosure is actionable under the Administrative Procedure Act ("APA") and is "not in accordance with law"—the Trade Secrets Act ("TSA"), 18 U.S.C. § 1905—and otherwise arbitrary and capricious.  5 U.S.C. § 706(2).

6.      Interim and permanent injunctive and declaratory relief are all in order because further disclosure will cause DI competitive harm.

## THE PARTIES

7.      DI is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the Commonwealth of Virginia and its principal office at 1700 Old Meadow Road, McLean, VA 22102.  DI's sole member is DynCorp International Inc., a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the Commonwealth of Virginia and its principal office at 1700 Old Meadow Road, McLean, VA 22102.

8.      Defendant U.S. Department of State Bureau of International Narcotics and Law Enforcement Affairs is the federal agency that has unlawfully released and disclosed DI's trade secrets and has refused to take action to protect DI's trade secrets.  It is headquartered in the Harry S. Truman Building located at 2201 C Street, NW, Washington, D.C. 20520.

9.      Defendant James A. Walsh is the Senior Bureau Official for International Narcotics and Law Enforcement Affairs.  Mr. Walsh's business address is 2201 C Street, NW, Washington, D.C. 20520.  Mr. Walsh is sued in his official capacity only.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

11.     The relief requested is authorized by 5 U.S.C. §§ 701-706 (Administrative Procedure Act) and 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act).

12.     This Court has personal jurisdiction over Defendants and venue is proper pursuant to 28 U.S.C. § 1391 and 5 U.S.C. § 703, because the Bureau is located in the District of Columbia and the Senior Bureau Official's business address is located in the District of Columbia.

## STATEMENT OF FACTS

### Relevant Background

13.     DI is a multi-billion dollar company that provides critical aircraft maintenance, logistics support, law enforcement and intelligence training, and base and contingency operations around the world on behalf of the Bureau in furtherance of national security interests.

14.     For the last 23 years, DI has held Contract No. SAQMMA12C1103 and its predecessor contracts—contracts for services with the Bureau of International Narcotics and Law Enforcement Affairs (hereinafter, collectively, the "INL/A Contract") in support of the Bureau's Worldwide Aviation Support Services program.

15.     As its core mission under the INL/A Contract, DI has provided aviation and related services in support of counter-narcotics operations and illicit drug eradication efforts in numerous countries around the world, including Afghanistan, Colombia, Cyprus, Iraq, Pakistan, Panama, and Peru.

16.     To support this critical mission, the INL/A Contract is a contract for specific services, not goods.  In particular, DI was required to: (a) provide effective program

management, (b) provide a comprehensive safety program, (c) conduct effective and safe air operations in each country, (d) provide effective maintenance and ensure availability of aircraft, and (e) provide effective logistical services.

17.     The Bureau re-competed the work required under the INL/A Contract, and awarded a new contract to one of DI's competitors.  The parties are in the midst of a transition period.

18.     DI routinely competes against other contractors, including the awardee of the most recent iteration of the INL/A Contract, on federal contracts.

### The DI SOPs Are Trade Secrets And Proprietary Information

19.     Over the course of many years, including DI's 23-year performance of the INL/A Contract, DI established and developed the DI SOPs using its pre-existing and proprietary know-how and experience.  DI developed the SOPs for its own use to help it perform the mission requirements under the contract.

20.     The proprietary know-how found in the DI SOPs relates, in general terms, to operations, processes, and procedures used to help DI complete performance requirements efficiently and effectively—on not only the INL/A Contract but also a variety of other contracts. Such proprietary know-how has provided DI a price- and performance-based advantage.

21.     The proprietary know-how embodied in the SOPs is not shared with the general public or DI's competitors.  The secrecy with which they are held provides DI a competitive advantage when bidding on contracts throughout the U.S. Government and at numerous agencies, such as the U.S. Army, the U.S. Navy, the U.S. Air Force, NASA, and the U.S. State Department.

22.     In other words, the DI SOPs are proprietary because they include DI's "secret sauce"—a mix of accumulated knowledge on operations, management, inventory control, and quality control processes that gives DI a competitive advantage in providing efficient and effective service to its customers.  The DI SOPs would provide a particular advantage on aircraft services contracts in difficult locations all over the world such as Iraq, Afghanistan, and Colombia.  Further, the DI SOPs contain proprietary know-how that can be applied to all sorts of contracts, for numerous U.S. Government customers, all around the globe.

23.     The DI SOPs are administrative and managerial in nature.  They are manuals or tools that DI uses to instruct its employees how to specifically perform the services that are the actual mission-related contractual requirements.

24.     By way of example, the DI SOPs provide directions to DI employees on how to complete administrative tasks, such as the process of acquiring property, including how to categorize that property and manage inventory control and how to ensure that the applicable quality, safety, and value standards are met.

25.     The DI SOPs have great economic value.  They were developed incrementally by DI over many years, and thus they would be valuable to a competitor seeking to learn the best way to perform the required services.

26.     DI SOPs also hold value because they can be used and tailored for use—by DI or a competitor—across a range of aviation and logistics services and other services that may be required throughout the U.S. Government, not just those specific to the INL/A contract.[1]

---

[1] The protected material in the DI SOPs is also exempted from a Freedom of Information Act ("FOIA") disclosure, because it consists of proprietary business information not subject to public disclosure per Exemption 4.  The TSA, the scope of which is "at least coextensive with Exemption 4," *CNA Financial Corp. v. Donovan*, 830 F.2d 1132, 1151 (D.C. Cir. 1987), effectively prohibits an agency from releasing information subject to FOIA exemption.  *See*

27.    In the hands of a competitor, the DI SOPs could be used to adjust and improve the competitor's own operations and processes, which are the primary distinction that distinguishes one service contractor from another.  Moreover, the competitor could use this inside knowledge unfairly when competing directly against DI on future government bids.

28.    In total, DI created 681 DI SOPs that are at issue in this case.

### DI Took Reasonable Measures To Protect Its Trade Secrets

29.    DI is the sole owner of the DI SOPs (its trade secrets) and was in possession of the trade secrets at all material times.

30.    DI's trade secrets are not generally known or readily ascertained using proper means by others.

31.    DI took reasonable efforts to maintain the secrecy of its trade secrets, including by withholding the information from competitors and third parties (except business partners who have a need for access to such information and who have executed agreements to maintain confidentiality) and by requiring its employees to sign agreements confirming their obligation to maintain the confidentiality of such information.

32.    DI took steps to mark and label the DI SOPs as proprietary.

33.    In fact, all of the 681 DI SOPs are stamped with a restrictive legend marking the information as proprietary and precluding disclosure by the Bureau.

34.    DI used several different iterations of the restrictive legend, including the following language:

    a.    "For Reference Only—'Proprietary Information'   This Document contains
          proprietary and privileged information of DynCorp International Patrick Support

---

*McDonnell Douglas Corp. v. Widnall*, 57 F.3d 1162, 1164 (D.C. Cir. 1995) ("whenever a party succeeds in demonstrating that its materials fall within Exemption 4, the government is precluded from releasing the information by virtue of the Trade Secrets Act").

Division, and shall not be disclosed or used for the benefit of others without prior written permission of DynCorp International Patrick Support Division."

b. "Before using this document, the reader is responsible in ensuring that it is the most current version available by comparing it with the online (master) version. Information contained herein is proprietary to DI."

c. "This document contains confidential and propriety information of DynCorp International. Unauthorized use, reproduction, or distribution is strictly prohibited."

d. "Before using this document, the reader is responsible in ensuring that it is the most current version available by comparing it with the online (master) version. Information contained herein is proprietary to DI."

35.     At no point during performance of the INL/A Contract did anyone within the Bureau challenge these designations of the DI SOPs as confidential and proprietary or request that the designations be removed.

36.     At no point during performance of the INL/A Contract did anyone within the Bureau challenge DI's ownership of the DI SOPs.

37.     In fact, in its own correspondence, the Bureau referred to DI SOPs as "DI SOPs"—indicating that the Bureau also considered them to be DI's own operating procedures.

**The DI SOPs Are Not Contract Deliverables Under The INL/A Contract**

38.     DI developed the DI SOPs over time for its own use. Their purpose is to provide direction to DI's employees specifically *how* to perform the INL/A Contract service requirements.

39.     DI developed the SOPs at its own expense and was not paid by the Bureau for the development of the DI SOPs.

40.     The DI SOPs were not a line-item or other deliverable under the INL/A Contract.

41.     Nothing in the INL/A Contract confers any rights to the DI SOPs upon the Bureau.

42.     DI did not develop the DI SOPs as part of the work performed under the INL/A Contract.

43.     Specifically, the INL/A Contract did not require DI to create or specifically develop the DI SOPs.

44.     The Bureau never contested DI's ownership of the DI SOPs throughout the entire period of performance by DI.

45.     Notably, by contrast, in the most recent iteration of the INL/A Contract awarded to DI's competitor and under which DI's competitor will be performing, the requirement to issue standard operating procedures is now listed as a line item.

46.     This change in the INL/A Contract's requirements shows that the Bureau knew that the new contractor, and DI's competitor, could not simply use the DI SOPs as its own. Instead, the Bureau required the new contractor to provide its own SOPs as a new contract deliverable.

**The DI SOPs Were Put On A Bureau Server Solely So That DI Employees Could Access Them From Various Countries While Performing The INL/A Contract**

47.     The DI SOPs were stored on the Defendants' server (the "Server"), not as a method of providing a contract deliverable to the Bureau, but rather so that DI's employees stationed in unstable, remote locations such Pakistan, Afghanistan, Iraq, and Columbia, could safely and securely access all of the information needed to perform the INL/A Contract.

48.     Placement of the DI SOPs on the Server was the only option for DI's employees, and did not convert the DI SOPs to a deliverable to the Bureau.  As a result of the worldwide placement of DI's employees, and the sensitive nature of the work performed by DI, the Server was the only secure server approved by the Bureau for use by DI while performing the INL/A Contract.

49.     The nature of the INL/A Contract required everything to be housed on the Server, including all of the logistics, purchasing and maintenance records as well as DI SOPs.

50.     DI and the Bureau were the only two entities with access to the Server during the course of DI's performance of the INL/A Contract.

51.     Until transition of the INL/A Contract, only the Bureau employees working on the INL/A Contract and DI employees working on the INL/A Contract had access to the Server.

52.     At all relevant times, DI remained the sole owner of the DI SOPs, and at no point transferred its rights in the DI SOPs to the Bureau.

53.     For the foregoing reasons, the Bureau did not inherently acquire rights in the DI SOPs that DI internally developed to meet the performance objectives of the INL/A Contract using DI's proprietary know-how.

**DI Did Not Agree To Disclose The DI SOPs To Its Competitor And Specifically
Requested The Bureau Remove The DI SOPs From The Bureau Server**

54.     On November 1, 2017, the Bureau began to transition the prior INL/A Contract held by DI to a new contractor who was awarded the follow-on contract to the INL/A Contract.

55.     On November 9, 2017, DI attended an initial transition kick off meeting, which was hosted by the Bureau.  During the meeting, DI employees spoke with Jamie Goewey—the Bureau's Contracting Officer for the INL/A Contract.  During that conversation, Jamie Goewey asked if DI would release its proprietary DI SOPs.  DI employees stated that they would *not* release the DI SOPs.

56.     In early 2018, DI's Deputy Program Director for the INL/A Program attended a transition plan meeting with Felix Rodriquez from the Bureau and a representative from the new contractor.

57.     During that meeting, DI inquired when the new contractor's SOPs would be available, as DI needed them to perform its own transition-related tasks.

58.     The representative from the new contractor represented that its SOPs were already written, but the new contractor was waiting for certain employees to transition from DI to the new contractor before the SOPs would be published.

59.     On March 5, 2018, DI's Vice President for the Air Wing Program had a telephone meeting with the Program Director for the new contractor related to the transition of the INL/A Contract.

60.     During that conversation, DI informed the Program Director that the DI SOPs were DI's proprietary property that would not be transferred to the new contractor during transition.

61.     The Program Director from the new contractor in response stated that the new contractor likely would need to seek relief from the terms of the follow-on INL/A Contract for a year to allow the new contractor time to write and establish its own SOPs, contrary to the new contractor's earlier representation that they already had been completed.

62.     On March 6, 2018, Jamie Goewey emailed DI to request the release of certain DI documents to the new contractor, which were listed on an attached Excel spreadsheet.  She referred to the listed documents as SOPs and incorrectly asserted that the SOPs were not proprietary to DI.

63.     Jamie Goewey copied the following Bureau officials on the email: Patrick Murphy, the Contracting Officer for new contractor's INL/A Contract; Brian Craddock, Chief, Program Support Division, INL; Renee Alexander, Management Analyst, Kelly A. Bless, Budget Analyst, Michele L. Coccovizzo, Program Analyst; Robert P. Curry, Contracting Officer's

Representative; Randal D. Jenkin, Financial Management Cost Analyst; Shaina Klockowski, Cost Analyst/Examiner; Robert W. Lang, Financial Management Cost Analyst; Timothy J. Pieper, Budget Analyst; and William A. Smoot, Contract Specialist.

64.     In response, on March 6, 2018, DI emailed Jamie Goewey to make sure that DI understood the Bureau's request.  DI asked whether the Bureau was asserting that all of DI's proprietary information, including internal documents prepared at its own expense to perform DI's work over the years, was now the Bureau's property.

65.     DI reminded the Bureau that those documents, which were not identified or required by the contract, or paid for by the Government, were marked proprietary by DI.  DI further explained that this was the first time that the Bureau challenged DI's proprietary markings.  DI then requested a meeting to discuss Bureau's request.

66.     On March 16, 2018, Jamie Goewey held a conference call with DI, including DI's Contracts Director for the Patrick Support Division, DI's lawyers, and others, in which the Bureau clarified that the Bureau was requesting only 69 specific training documents, none of which were the proprietary DI SOPs.

67.     The Bureau officials that attended that conference call included: Jamie Goewey, Brian Craddock, Robert P. Curry, Kathleen Martin (Attorney Advisor), and Cecile Washington.

68.     After the meeting, on March 16, 2018, DI confirmed in writing that no DI SOPs were being requested for release and that, in the event the Bureau sought additional documents in the future, the parties had agreed on a protocol whereby the Bureau would make a formal request for release of specific documents and DI would consider that request.

69.     Later that day, DI hand-delivered Jamie Goewey a disc containing the requested 69 documents, which consisted of Bureau-owned materials.  The disc did not contain any DI

SOPs, or any documents DI had marked as proprietary.  The Bureau signed for a receipt of for the disc containing those documents.

70.     On March 29, 2018, DI's Vice President for the INL Air Wing for DynAviation, Joe Dunaway, informed Bureau INL/A Director Phil Schlatter that the DI SOP issue remained outstanding.

71.     In response, Director Schlatter agreed that there was no reason for the new contractor to have the DI SOPs, as their follow-on contract had different metrics than DI's INL/A Contract.  At no point did Director Schlatter state that it was "obvious that the competitor would utilize the DI SOPs in performance of the follow-on contract" or any words to that effect.

72.     On March 30, 2018, after receiving DI's repeated objections to the disclosure of its SOPs, Jamie Goewey informed DI that the issue of access to DI SOP's would be addressed in an upcoming modification of the INL/A Contract.

73.     On April 4, 2018, DI sent a letter to Jamie Goewey demonstrating in detail the basis for DI's position, explaining that neither the Bureau nor DI's competitor had rights to the DI SOPs.  DI also requested that DI's competitor be prohibited from accessing, disclosing, or using the DI SOPs for any purpose, and that the DI SOPs be returned to DI.  DI specifically requested that the Bureau delete the DI SOPs from the Server.

### The Bureau Expressly Promised To Protect The DI SOPs And Misled DI

74.     On April 5, 2018, Jamie Goewey responded to DI by email, copying Brian Craddock, and stated that the Bureau would take DI's request under advisement.  Jamie Goewey refused to remove the DI SOPs from the Server.  However, she assured DI that the Bureau "will ensure the integrity of proprietary data is preserved."

75.     In the same email, Jamie Goewey confirmed that the Bureau would provide a formal response once all Bureau stakeholders had the chance to review DI's "request." At no point did Jamie Goewey even insinuate what was later conveyed to DI in the April 26, 2018 letter from the Bureau —"[t]he fact that [the new contractor] would utilize those work materials in performance of the follow-on contract is obvious." (The Bureau's April 26, 2018 letter is hereinafter referred to as the "Decision").

76.     Notwithstanding Jamie Goewey's assurances that the Bureau would "ensure the integrity of proprietary data," DI received a copy of the new contractor's Iraq Program phase-out (transition) plan, in which the new contractor yet again assumed it would have access to the DI SOPs (as it had assumed in earlier phase-out plans involving Panama and Peru).

77.     On or about April 12, 2018, DI received a modification to extend the term of the INL/A Contract during the transition to the new contractor.

78.     The modification did not address the protection of, or limited access to, DI SOPs by the new contractor.

79.     On April 12, 2018, DI again emailed the Bureau to express DI's concerns regarding the protection of the DI SOPs stored on the Server. DI received no reply from the Bureau.

80.     In that email, DI requested clarification with respect to INL/A's statement that the Bureau will "ensure the integrity of proprietary data is preserved." Specifically, DI asked whether DI's proprietary documents were moved to folders with limited access or were password protected. DI also inquired who at INL/A would retain access to DI proprietary documents and what the purpose for that access was.

81.     The Bureau did not respond to DI's email.

82.     On April 18, 2018, Jamie Goewey advised that there already was "significant slippage of [the new contractor's] transition dates"—that is, that the new contractor was having trouble doing what was necessary to perform on the timeline the Bureau wanted.

**DI Learns That Its Competitor Accessed The DI SOPs And Improperly Used Them As Its Own While The Bureau Pretended To Be Investigating DI's Concerns**

83.     On April 20, 2018, DI discovered that, despite the Bureau's assurances that it would "ensure the integrity of proprietary data is preserved," the Bureau had allowed the new contractor unrestricted access to the Server and as a result the new contractor had plagiarized DI SOPs and submitted it them to the Bureau as its own ("New SOPs").  DI immediately sent a request to the Bureau demanding that the Bureau protect its proprietary information.

84.     Specifically, on April 20, 2018, DI's Deputy Program Manager for the Air Wing Program was reviewing the Server and observed that there were New SOPs on the Server that were virtually identical to the DI SOPs except that they now contained the new contractor's logo.

85.     DI's Contracts Director for the Patrick Support Division ran a redline comparison in Microsoft Word between the DI SOPs and the New SOPs.  The redline comparison confirmed that the New SOPs were virtually identical, except that the competitor had replaced DI's logo with its own, and had replaced any reference to DI with the new contractor's name.

86.     In other words, the Bureau had made DI's proprietary documents available for DI's competitor to view on the Server and the competitor plagiarized the DI SOPs by keeping virtually all the information, but changing the logos and names of the company to make them appear as their own.  The new contractor then submitted to the Bureau re-labeled DI SOPs as a deliverable under the new contractor's contract.

87.     That same day, April 20, 2018, after realizing that the new contractor had downloaded, plagiarized, and unlawfully used the DI SOPs, DI emailed Jamie Goewey to inform her that the DI SOPs had been stolen and plagiarized by the new contractor.

88.     In that email, DI provided copies of a redline comparison showing that the new contractor had taken DI SOPs and replaced the logo and name with its own, and then re-uploaded those plagiarized versions to the Server as part of the new contractor's deliverables under the follow-on INL/A Contract.

89.     DI further reminded the Bureau that it was not authorized to provide DI's proprietary information to the new contractor.

90.     DI further advised the Bureau that the unauthorized release of the DI SOPs to a competitor is unlawful and may result in significant competitive harm to DI.

91.     On the same day, DI also sent a cease-and-desist notice to the new contractor regarding, among other things, its unauthorized use of DI SOPs.

92.     On or about April 23, 2018, having not heard from the Bureau on this issue, despite having had numerous communications with the Bureau on other issues, DI asked Brian Craddock when it could expect a response from the Bureau.

93.     In response, Mr. Craddock stated that he had asked the new contractor for the source of its New SOPs that it had submitted to the Bureau as a contract deliverable under the follow-on INL/A Contract, but that the new contractor had not yet responded to him.  At no point did Mr. Craddock state what was later conveyed to DI in the Decision—"[t]he fact that [the new contractor] would utilize those work materials in performance of the follow-on contract is obvious"—or any other words to that effect.

**Instead of Protecting DI's Proprietary Information, The Bureau Issues Its Decision
Seeking To Justify Its Improper Actions With Newly Asserted And Erroneous Statements**

94.     Finally, on April 26, 2018, the Bureau emailed DI its final Decision on the matter, in which it expressly responded to DI's April 4, 2018 letter.  A true and correct copy of the Decision is attached hereto as **Exhibit A**.

95.     The Decision was authored and signed by Kathleen D. Martin, Attorney Advisor to the U.S. Department of State, located in Washington D.C., "on behalf of the Department," and addressed to the DI Contracts Director for Patrick Support Division.

96.     Ms. Martin emailed the Decision to the DI Contracts Director for the Patrick Support Division, and copied Bureau officials including: Jamie Goewey, Patrick Murphy (the Contracting Officer for the new contractor's follow-on contract), John Stever, and Brian Craddock.

97.     The Decision erroneously asserted: "The fact that [the new contractor] would utilize those work materials in performance of the follow-on contract is obvious."

98.     Neither Jamie Goewey nor Brian Craddock had ever suggested as much in all their conversations with DI on the matter, in which they had promised follow-up to protect DI's proprietary information rather than questioning whether that information deserved protection in the first place.

99.     The Bureau belatedly asserted this erroneous conclusion only after: (1) it allowed DI's competitor to plagiarize the DI SOPs while failing to put DI on notice that it was doing so, (2) DI's competitor admitted to DI that, if it had to meet its obligations without the DI SOPs it might be delayed a year, and (3) the Bureau informed DI on April 18, 2018, that there was a "significant slippage of the transition dates" requiring additional services from DI not contemplated in the modification provided to DI just six days earlier on April 12, 2018.

100.    In the Decision, the Bureau, for the first time, falsely asserted that DI had only recently placed a proprietary legend on the DI SOPs (when actually the language had been included on the DI SOPs for at least a decade) and misquoted language that was not actually on any of the DI SOPs.

101.    In the Decision, the Bureau, also for the first time, took the positon that it was not appropriate for DI to mark the DI SOPs as proprietary, which ignored the parties' course of conduct over many years, during which the Bureau never objected to DI's treatment of the DI SOPs as proprietary, and in which the Bureau also referred to them as DI SOPs.

### The Bureau Expressly Authorized The New Contractor To Access And Use The DI SOPs Notwithstanding Proprietary Markings and DI's Repeated Warnings

102.    On May 1, 2018, DI received a letter from the new contractor, dated one day before the Decision—or April 25, 2018.  The letter stated that the Bureau had authorized the new contractor to access and use all of the records on the Server, including the DI SOPs, notwithstanding any proprietary markings by DI.

103.    The new contractor further explained that the Bureau assured the new contractor that the Bureau had unlimited rights to all of the records on the Server, regardless of whether they were authored by the Bureau or DI.

104.    This letter confirmed that despite the Bureau's promise to "ensure the integrity of proprietary data is preserved," the Bureau gave the new contractor free rein to download and use all of the records on the Server, including DI SOPs.

105.    In its April 25, 2018 letter, the new contractor copied Patrick Murphy,[2] the Contracting Officer responsible for the new contractor's INL/A Contract.

---

[2] Mr. Murphy is the Contracting Officer for the new INL/A Contract, the procurement of which contract was the subject of an IG investigation.  In his role as Contracting Officer, Mr. Murphy

106.    Upon information and belief, Patrick Murphy was a Bureau official who provided authorization to the new contractor to access and use all of the records on the Server and who told the new contractor that the Bureau had unlimited rights to all documents on the Server, notwithstanding any proprietary markings by DI.

107.    Patrick Murphy was copied on emails indicating that DI claimed the DI SOPs as proprietary and when the Bureau said they would respect DIs proprietary documents.

### DI Has Been And Will Be Harmed As A Result Of The Improper Disclosure

108.    It is presently unclear how many of DI's propriety documents have been copied by the new contractor, although DI is aware that several DI SOPs have been misappropriated.

109.    DI intends to use the DI SOPs to compete for and perform other government contracts with a similar scope of work to the INL/A Contract.

110.    DI and the new contractor compete regularly on contracts of a similar scope to the INL/A Contract.

111.    A significant differentiator between the competitors is the way in which they are able to perform under a contract.  Prior to, and during its 23 years of performance on the INL/A Contract, through the DI SOPs, DI developed the most efficient and effective methodologies and procedures as to how to best provide services to the government.

---

was directly responsible for a procurement that the Court of Federal Claims described as "troubling." The new contractor attempted to send the letter to DI on April 25, 2018, using an incorrect email address, but copied Mr. Murphy on its April 25, 2018 email.  Notably, the new contractor issued its letter to DI and Mr. Murphy before the Bureau informed DI of the Decision and during a time that the Bureau led DI to believe that it was investigating the new contractor's plagiarism.  Thus, Mr. Murphy was aware that the Bureau had said it would respect DI's rights in its trade secrets, yet upon information and belief, he disregarded his responsibilities and allowed DI's competitor unfettered access to DI's proprietary information, which the Decision then attempted to justify based on false assertions of fact.  The exact role of Mr. Murphy in the Bureau's violation of the Trade Secrets Act is one subject of Plaintiff's Motion for Expedited Discovery.

112.    The Bureau's disclosure of the unique data developed at DI's time, effort and expense will cause irreversible harm in that it will suffer the loss of its competitive edge as a leader in this market, and loss of its strong position in the commercial and government contract markets.

113.    Further, the disclosure will make DI vulnerable to unfair competition from a competitor that can use inside information as to DI when competing directly against DI.

114.    Thus, the longer DI's competitor has access to DI's proprietary and confidential information, the more DI will be competitively harmed for future procurements.

115.    Injunctive relief is in the public interest because it will ensure that the Bureau complies with the applicable law.

## COUNT I

**THE BUREAU'S DECISION TO RELEASE DI'S TRADE SECRETS IS NOT IN ACCORDANCE WITH LAW, BECAUSE IT VIOLATES THE TSA**

116.    DI incorporates by reference all the preceding paragraphs.

117.    The Decision confirming that the Bureau will not take action to protect DI's trade secrets and restrict access by DI's competitor is a final agency action within the meaning of 5 U.S.C. § 704, and thus is a reviewable action as defined by the APA.  DI has exhausted all administrative remedies.

118.    Pursuant to 5 U.S.C. § 706(2)(A), a reviewing court shall hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

119.    The TSA prohibits federal officers and employees from disclosing information that "concerns or relates to the trade secrets, processes, operations, style of work, or apparatus . . . of any person, firm, partnership, corporation, or association."  18 U.S.C. § 1905.

120.    The DI SOPs constitute trade secrets or other protected information within the meaning of the TSA, 18 U.S.C. § 1905.

121.    Until transition of the INL/A Contract, both the Bureau and DI have both continuously maintained this information as confidential.

122.    The Bureau has released the DI SOPs to DI's competitor by providing unfettered access to them on the Server.  The Bureau thus continues to allow the competitor to download, copy, and unlawfully access and use the DI SOPs.

123.    The Bureau has failed to remove the DI SOPs from the Server, or prevent access thereto, despite DI's timely, repeated requests.

124.    The Bureau's failure to act to protect DI's trade secrets violates the TSA and thus should be held unlawful and set aside as not being in accordance with law.  *Cf. Megapulse Inc. v. Lewis*, 672 F.2d 959, 971 (D.C. Cir. 1982) (holding that district court had jurisdiction over APA claim based on TSA violation because claim was not based on breach of the related government contract, but was based on "an alleged governmental infringement of property rights and violation of the Trade Secrets Act").

125.    Injunctive relief is appropriate because DI has made a *prima facie* showing that the Defendants violated the TSA and that the decision to release DI's trade secrets and failure to take action to prevent access or use was unlawful, arbitrary, and capricious under the TSA and APA and should be set aside.

## COUNT II

### THE BUREAU'S DECISION TO RELEASE DI'S TRADE SECRETS CONSTITUTES ARBITRARY AND CAPRICIOUS AGENCY ACTION

126.    DI incorporates by reference all the preceding paragraphs.

127.    In addition to not being in accordance with law, the Bureau's decision to release DI's trade secrets should be held unlawful and set aside as otherwise arbitrary and capricious and an abuse of discretion under the APA.  5 U.S.C. § 706.

128.    DI has suffered and will continue to suffer irreparable harm if the Bureau does not prevent further access or use by the competitor to DI's trade secrets or protected information.

129.    Accordingly, DI is entitled to a temporary restraining order, preliminary injunction, and a permanent injunction barring the Bureau's release of DI's trade secrets to any third-parties and recovery and barring the use of DI's trade secrets in the performance of the INL/A Contract, pursuant to 5 U.S.C. § 706.

## COUNT III

### DECLARATORY JUDGMENT

130.    DI incorporates by reference all the preceding paragraphs.

131.    Pursuant to Rule 57 of the Federal Rules of Civil Procedure, "the existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate," and this Court "may order a speedy hearing of a declaratory-judgment action."

132.    There is an actual and definite controversy between the Bureau and DI concerning the release of, and failure to protect, DI's proprietary information which is ripe for adjudication.

133.    DI has an interest in the outcome of the controversy.

134.    The Bureau's action and inaction in providing unfettered access to the DI SOPs to DI's competitor and its failure to protect DI's trade secrets adversely affects DI.

135.    This Court has authority pursuant to 28 U.S.C. §§ 2201-2202 to declare the rights of DI with respect to the information at issue and the Bureau's actions, as follows:

136.    The information at issue is confidential commercial information obtained from a person (DI), is customarily kept confidential by DI, and the prior and continued release or disclosure of the information likely would result in substantial competitive harm to DI currently and in the future for the same or similar services, and the information therefore is protected by the Trade Secrets Act, 18 U.S.C. § 1905;

137.    The Bureau's decision to release the information at issue unlawful, arbitrary, capricious, an abuse of discretion or otherwise contrary to law under the TSA and APA; and

138.    DI is the sole owner of the DI SOPs, and at no point transferred its rights in the DI SOPs to the Bureau.

139.    A declaration that the DI SOPs constitute DI's proprietary information warranting protection from disclosure would provide relief to DI and provide the basis for permanent injunctive relief.

140.    A declaratory judgment in connection with a merits decision is necessary and appropriate in this case to resolve and afford relief from uncertainty regarding the parties' rights and obligations concerning the continued release of DI's proprietary information.

141.    DI requests that the Court order a speedy hearing on the declaratory relief sought herein pursuant to Federal Rule of Civil Procedure 57, order an expedited schedule for the Defendant to answer the Verified Complaint, advance this case on its Calendar, and order expedited discovery and briefing to enable a speedy hearing on the merits.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff DI prays that this Court grant the following relief:

A.    A temporary restraining order, pursuant to the Court's authority under 5 U.S.C. § 705: (1) setting aside the Decision and preventing Defendants from allowing any third-party

(including the new contractor) access to the DI SOPs on the Server (or anywhere else), and (2) preventing Defendants from allowing any third-party access to any other DI proprietary information.

      B.      Preliminary and permanent injunctive relief, pursuant to the Court's authority under 5 U.S.C. §§ 702 and 705: (1) setting aside the Decision and preventing Defendants from allowing any third-party (including the new contractor) access to the DI SOPs on the Server (or anywhere else); (2) preventing Defendants from allowing any third-party access to any other DI confidential or proprietary information; (3) directing the immediate removal of the DI SOPs from the Server (including those labeled as belonging to the new contractor); (4) directing the immediate removal of any DI proprietary information from the Server; (5) preventing Defendants from allowing the new contractor to access, plagiarize, or use the DI SOPs in any capacity, including, but not limited to, on the INL/A Contract; and (6) directing that the Bureau not retain copies of the DI SOPs, including returning or certifying destruction of all electronic or paper copies held within the Bureau or transferred to any other entity in or out of the federal government.

      C.      A declaratory judgment that:

      (i)      The information at issue is confidential commercial information obtained from a person (DI), is customarily kept confidential by DI, and therefore is protected by the Trade Secrets Act, 18 U.S.C. § 1905;

      (ii)      The information at issue is confidential commercial information obtained from a person (DI), prior and continued release or disclosure of the information likely would result in substantial competitive harm to DI currently and in the future for the same or similar services, and the information therefore is protected by the Trade Secrets Act, 18 U.S.C. § 1905; and

      (iii)      The Bureau's Decision to release the information at issue is unlawful, arbitrary, capricious, an abuse of discretion, or otherwise contrary to law in violation of the APA, 5 U.S.C. §§ 701-706.

D.      An order setting a speedy hearing on DI's declaratory judgment claim pursuant to

Fed. R. Civ. P. 57, and to facilitate that orders expediting the schedule for Defendants to answer

this complaint, expediting discovery, and expediting briefing.

E.      Costs and reasonable attorneys' fees incurred in this action pursuant to 28 U.S.C.

§ 2412.

F.      Such other relief as this Court deems just and proper.

Dated: May 11, 2018

Respectfully submitted,

**REED SMITH LLP**
Lawrence P. Block (DC Bar No. 452190)
Lawrence S. Sher (DC Bar No. 430469)
1301 K Street, N.W.,
Suite 1100 – East Tower
Washington, D.C. 20005
Tel: (202) 414-9266
Fax: (202) 414-9299
LBlock@reedsmith.com
LSher@reedsmith.com

*Attorneys for Plaintiff*
*DynCorp International LLC*

## VERIFICATION

I, the undersigned, Mario Troncoso, am employed by DynCorp International LLC as Contracts Director for the Patrick Support Division. As such, I have personal knowledge of the facts set forth in the attached Verified Complaint. I have reviewed the allegations of facts set forth in the Verified Complaint and under penalty of perjury under the laws of the United States of America hereby verify that foregoing is true and correct.

Executed on May 10, 2018.

Mario Troncoso